1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LANCE BAKKI,

                    Plaintiff,

    v.

THE BOEING COMPANY,

                  Defendant.

CASE NO. C20-0235JLR

ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND
GRANTING IN PART
PLAINTIFF'S MOTION TO SEAL

## I.    INTRODUCTION

Before the court are Defendant The Boeing Company's ("Boeing") motion for

summary judgment (MSJ (Dkt. # 21); *see also* MSJ Reply (Dkt. # 34)) and Plaintiff

Lance Bakki's motion to seal (MTS (Dkt. # 31)).  Mr. Bakki opposes Boeing's motion

for summary judgment.  (MSJ Resp. (Dkt. # 32).)  Boeing does not oppose, and joins in

part, Mr. Bakki's motion to seal.  (MTS Resp. (Dkt. # 36).)  The court has considered the

motions, the parties' submissions regarding the motions, the relevant portions of the

//

record, and the applicable law.  Being fully advised,[1] the court GRANTS in part and

DENIES in part Mr. Bakki's motion to seal and GRANTS Boeing's motion for summary

judgment.

## II.     BACKGROUND

Mr. Bakki, a former Boeing manufacturing manager, alleges that Boeing

discriminated against him on the basis of his race; retaliated against him; aided and

abetted discrimination against him; and wrongfully discharged him in violation of public

policy.  (*See generally* Compl. (Dkt. # 1-1).)  His claims arise from his report of a

mechanic for safety violations in December 2018, and his decision to move a different

mechanic to a new position in April 2019.  (*See id.*)  The court sets forth the factual and

procedural background of this matter below.

**A.     Factual Background**

1.     Mr. Bakki's Employment at Boeing

Mr. Bakki, who identifies as Caucasian, was originally employed by Boeing

between March 1998 and his layoff in 1999.  (Bakki Dep.[2] at 26:24-25, 27:1-2, 20-23.)

In November 2011, Boeing rehired Mr. Bakki as a first-line, or Level K, manufacturing

manager at Boeing's Everett, Washington location.  (*Id.* at 30:22-23, 31:12-19.)  In

---

[1] Neither party requests oral argument (*see* MSJ.; MSJ Resp.; MTS; MTS Resp.), and the court finds oral argument unnecessary to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[2] Both parties have submitted voluminous excerpts from Mr. Bakki's deposition.  (*See* Bushaw Decl. (Dkt. # 22) ¶ 2, Ex. A; Vizcaino Decl. (Dkt. # 32-2) ¶ 2, Ex. A; 2d Bushaw Decl. (Dkt. # 35) ¶ 2, Ex. W.)  For ease of reference, the court cites directly to the page and line number of the deposition.

1    November 2017, Boeing promoted Mr. Bakki to a senior, or Level L, manufacturing

2    manager for the Lean Manufacturing team for the 737 Wings Division in Renton,

3    Washington.  (*Id.* at 41:19-42:8.)

4            In February 2019, Boeing moved Mr. Bakki to Wings System Installation

5    ("WSI").  (*Id.* at 44:1-3.)  In this position, Mr. Bakki supervised eight first-level

6    manufacturing managers who reported directly to him.  (*Id.* at 44:15-19.)  As a Boeing

7    manager, he was responsible for certain employee safety policies and procedures.  (*See

8    id.* at 43:1, 47:3-15, 62:11-19.)  Mr. Bakki remained in this role until his termination in

9    August 2019.  (*See id.* at 44:1-3.)

10           2.    December 2018 Incident

11           On December 20, 2018, Mr. Bakki observed a Boeing employee sitting in the

12   middle of the production work area.  (*Id.* at 84:6-22.)  The employee was sitting with his

13   feet up, was using headphones, and was wearing his safety glasses on top of his head.

14   (*Id.* at 85:5-18.)  Mr. Bakki considered the employee's conduct a "blatant safety

15   violation."  (*See id.*)  Mr. Bakki could not immediately identify the person because he

16   was wearing his hoodie over his head.  (*Id.*)  He took a photograph of the employee to

17   document the violation.  (*See* Davis Dep.[3] at 112:1-5; Vizcaino Decl. ¶ 4, Ex. C.)

18           Mr. Bakki approached the employee and asked to talk with him about the safety

19   issues.  (Bakki Dep. at 87:3-13.)  The employee became "very confrontational" and

20

21           [3] Both parties have submitted voluminous excerpts from temporary supervisor Wade
     Davis's deposition.  (*See* Bushaw Decl. ¶ 5, Ex. D; Vizcaino Decl. ¶ 3, Ex. B; 2d Bushaw Decl. ¶
22   4, Ex. Y.)  For ease of reference, the court cites directly to the page and line number of the
     deposition.

ORDER - 3

began walking away.  (*Id.* at 87:14-18.)  He covered his badge, continued to walk away, and told Mr. Bakki to leave him alone.  (*Id.* at 87:19-24.)  Mr. Bakki learned that the employee was Quvia Boyd, who is African-American.  (*Id.* at 88:10-17.)

Later that day, Mr. Bakki encountered Mr. Boyd, Mr. Boyd's temporary supervisor Wade Davis, and four other hourly mechanics standing in a circle.  (*Id.* at 88:18-21, 89:2-8.)  Mr. Bakki asked to speak only with Mr. Boyd and Mr. Davis.  (*Id.* at 89:2-10.)  Mr. Bakki showed Mr. Davis the photograph he had taken of Mr. Boyd. (Davis Dep. at 48:1-9.)  Mr. Boyd became angry and argumentative, and he cursed at Mr. Bakki.  (Bakki Dep. at 89:11-18; Boyd Dep.[4] at 103:14-15.)  Later that day, Mr. Bakki completed paperwork to report Mr. Boyd's safety violations.  (Bakki Dep. at 93:2-17.)

On January 7, 2019, Boeing Employee Relations Fact-Finder Katie Kilman initiated an investigation of Mr. Bakki's allegations against Mr. Boyd.  (Kilman Decl. (Dkt. # 23) ¶ 4.)  She interviewed Mr. Boyd on January 22, 2019.  (*Id.* ¶ 5.)  Mr. Boyd told Ms. Kilman that Mr. Bakki had harassed him and had grabbed for his badge, and that Mr. Davis had given him permission to take a break.  (*Id.* ¶ 6, Ex. H (Email thread between Ms. Kilman and Mr. Boyd).)  On January 23, 2019, Mr. Boyd stated that Mr. Bakki had told Mr. Davis, in reference to Mr. Boyd, that "[Mr. Davis] needs to find his boy some work to do."  (*Id.*)

//

//

---

[4] Both parties have submitted excerpts from Mr. Boyd's deposition.  (*See* Bushaw Decl. ¶ 4, Ex. C; Vizcaino Decl. ¶ 5, Ex. D; 2d Bushaw Decl. ¶ 3, Ex. X.)  For ease of reference, the court cites directly to the page and line number of the deposition.

Boeing Corporate Investigator Cheryl Harding investigated Mr. Boyd's report that Mr. Bakki had treated him disrespectfully and referred to him as "boy."[5]   (Harding Decl. (Dkt. # 27-1) ¶ 3.)  Ms. Harding interviewed Mr. Boyd on February 18, 2019.  (*Id.* ¶ 5.) Mr. Boyd confirmed that Mr. Bakki referred to him as "boy" during his conversation with Mr. Davis.  (*Id.*, Ex. I.)  Mr. Boyd also stated that he was "going to let this go" until he learned that Mr. Bakki had filed a complaint against him.  (*Id.*)

Ms. Harding interviewed Mr. Davis on March 5, 2019.  (*Id.* ¶ 6.)  Mr. Davis corroborated that Mr. Bakki had referred to Mr. Boyd as "boy."  (*Id.*, Ex. J.)  Mr. Davis stated, however, that he did not believe that Mr. Bakki's statement was "in any way racial" and that both he and Mr. Bakki came "from military backgrounds where subordinates are referred to as 'boy.'"  (*Id.*)  Ms. Harding wrote that Mr. Davis believed both Mr. Boyd's and Mr. Bakki's "reactions and miscommunication toward each other ha[d] caused this situation to be blown out of proportion."  (*Id.*)

Ms. Harding interviewed Mr. Bakki on March 6, 2019.  (*Id.* ¶ 7.)  Mr. Bakki told Ms. Harding that he could not recall referring to Mr. Boyd as "boy" during his conversation with Mr. Davis.  (*Id.* ¶ 7, Ex. K (Mr. Bakki's confirmation of Ms. Harding's written summary of their interview).)  He stated that "the phrase 'boy' . . . is not part of [his] vocabulary."  (*Id.*)  Mr. Bakki later testified that he flatly denied to Ms. Harding that he referred to Mr. Boyd as "boy."  (Bakki Dep. at 105:20:23.)  He testified that he instead told Mr. Davis, "Clearly, Boyd needs more work . . . .  He's sitting over there breaking all

---

[5] Ms. Kilman suspended her investigation of Mr. Boyd's safety violations during Ms. Harding's investigation.  (Kilman Decl. ¶ 8.)

1   these safety rules . . . .  If he needs to go do something, there's plenty to do around here."

2   (*Id.* at 89:14-16.)

3          On March 19, 2019, Ms. Harding submitted her report of her investigation to

4   Boeing's Employee Corrective Action ("ECA") team for review.  (*Id.* ¶ 8; *see also id.*

5   ¶ 8, Ex. L ("Harding Rep.").)  Ms. Harding substantiated Mr. Boyd's allegation that Mr.

6   Bakki made a derogatory race-based comment by referring to Mr. Boyd as "boy" during

7   his conversation with Mr. Davis on December 21, 2018.  (*Id.* ¶ 9; *see also* Harding Rep.

8   at 2.)  She found that Mr. Bakki's conduct violated Boeing's Workplace and Sexual

9   Harassment Policy, PRO-4332.  (Harding Rep. at 2; *see* Harding Decl. ¶ 9, Ex. M

10  (PRO-4332 policy).)

11         On April 2, 2019, Mr. Bakki's manager, Doug Coughlin, issued Mr. Bakki a

12  Corrective Action Memorandum ("CAM") informing him that he had received a written

13  warning for violation of PRO-4332.  (*See* Bushaw Decl. ¶ 3, Ex. B.)  Although Mr. Bakki

14  disagreed with Boeing's decision to issue him a corrective action, he did not complain to

15  anyone at Boeing that he believed the written warning was discriminatory.  (Bakki Dep.

16  at 131:13-24.)  Subsequently, Ms. Kilman substantiated Mr. Bakki's allegation that Mr.

17  Boyd had violated safety procedures by failing to wear safety glasses.  (Kilman Decl.

18  ¶ 9.)  On May 1, 2019, Boeing issued Mr. Boyd a written warning for this violation.  (*See*

19  *id; see also* Vizcaino Decl. ¶ 17, Ex. I (sealed).)

20         3.     Spring 2019 Retaliation Allegation

21         In March 2019, Mr. Bakki and other managers were required to reassign nine

22  mechanics to positions on the shop floor that were in need of personnel.  (*See* Bakki Dep.

at 191:5-13.)  Mr. Bakki worked with other managers to identify mechanics to move temporarily to a position known as "position zero" on the P-8 production line.  (*Id.* at 191:5-13; Vizcaino Decl. ¶ 12, Ex. N ("6/11/19 Bakki Statement"); *id.* ¶ 16, Ex. T ("Ramsey Dep.") at 55:12-14.)  Mr. Bakki selected Stephen Ramsey as one of the mechanics to be moved.  (*See* 6/11/19 Bakki Statement.)

Mr. Ramsey had a long history of reporting safety concerns.  In approximately 2015, Mr. Ramsey became involved with the implementation and enforcement nof Boeing's Lockout-Tagout ("LOTO") safety system for "stored energy" systems such as hydraulics.  (Ramsey Dep at 16:10-15, 18:6-8.)  The LOTO system is designed to prevent injuries that can occur stored energy systems are released.  (*Id.* at 16:11-15.)  He submitted multiple Safety Health Environment Action Requests ("SHEARs") relating to safety concerns to Boeing Environment Health and Safety ("EHS") for review.  (*Id.* at 21:12-17, 22:4.)  Mr. Ramsey also reported Boeing for workplace safety issues to Washington's Department of Labor and Industries ("L&I").  (*See* Bakki Dep. at 181:17-21.)

Mr. Bakki was aware that Mr. Ramsey had three open SHEARs, some of which related to LOTO, and he was working with Mr. Ramsey and EHS to address the SHEARs.  (Bakki Dep. at 184:8-9, 185:15-19; *see also* 6/11/19 Bakki Statement; Ramsey Dep. at 50:2-24, 51:1-4.)  He states that he selected Mr. Ramsey because his experience was needed on the P-8 line.  (*Id.* at 192:6-10; *see also* Bakki 6/11/19 Statement.)  Mr. Bakki's supervisor, Mr. Coughlin, approved Mr. Bakki's decision to move Mr. Ramsey to position zero.  (Bakki Dep. at 192:13-18.)

On April 25, 2019, Mr. Bakki, a union shop steward, and a Boeing manager presented Mr. Ramsey with a move memo. (Vizcaino Decl. Ex. P; Ramsey Dep. at 53:21-54:1.)  When Mr. Ramsey asked why Mr. Bakki was moving him , Mr. Bakki explained that his experience was needed in position zero.  (Ramsey Dep. at 55:2-9.)  Mr. Ramsey felt that it was "highly irregular" that his manager would bring a second manager and a union steward with him when he delivered the move memo.  (*Id.* at 53:21-54:2.)

On May 6, 2019, Mr. Ramsey complained that Mr. Bakki and temporary first-line manger Kyle Myler had retaliated against him for raising safety concerns in his SHEARs and enforcing Boeing's LOTO procedure.  (*See* Weaver Decl. (Dkt. # 3) ¶ 3; *see also id.* ¶ 8, Ex. R ("Weaver Rep.").)  Boeing Corporate Investigator Carl Weaver investigated Mr. Ramsey's complaint.  (*See* Weaver Decl. *¶ 3.*)  Mr. Weaver interviewed Mr. Ramsey, Mr. Bakki, Mr. Coughlin, and an employee who wished to remain confidential because he feared retaliation.  (*See id.* ¶¶ 4, Ex. N ("5/13/19 Ramsey Statement"); *id.* ¶ 5, Ex. O ("5/16/19 Confidential Statement"); *id.* ¶ 6, Ex. P ("6/11/19 Bakki Statement"); *id.* ¶ 7, Ex. Q ("6/18/2019 Coughlin Statement").) [6]

Mr. Ramsey told Mr. Weaver that he had long faced conflict and criticism from workers and managers due to his efforts to report and remedy safety concerns.  (*See* 5/13/19 Ramsey Statement.)  He stated that he heard from another employee that he had been moved because of his strict practice of compliance with LOTO policies and procedures.  (*Id.*)  The confidential witness reported that Mr. Myler had told him that the

---

[6] Mr. Bakki also submitted copies of the Ramsey, Bakki, and Coughlin statements.  (*See* Vizcaino Decl. ¶¶ 11-13, Exs. M, N, Q.)

1   managers were moving Mr. Ramsey because they were frustrated with his "stance"

2   regarding LOTO.  (5/16/19 Confidential Statement.)  The witness stated that Mr.

3   Ramsey's role with respect to LOTO enabled him to determine who could and could not

4   work in close proximity to the aircraft wing assembly, which caused delays in production

5   that "the managers do not like."  (*Id.*)  Mr. Bakki denied that he had moved Mr. Ramsey

6   to position zero for retaliatory reasons.  (*See* 6/11/19 Bakki Statement.)  He stated that

7   Mr. Ramsey's experience was needed on the P-8 line.  (*Id.*)  Mr. Coughlin also denied

8   that Mr. Bakki's decision to move Mr. Ramsey was retaliatory.  (6/19/19 Coughlin

9   Statement.)  He told Mr. Weaver that he had never witnessed Mr. Bakki retaliate against

10   anyone, that he did not tolerate retaliation, and that he did not believe Mr. Bakki would

11   tolerate retaliation.  (*Id.*)

12       Mr. Weaver substantiated Mr. Ramsey's allegation that Mr. Bakki had moved Mr.

13   Ramsey to position zero and removed his position of authority in LOTO in retaliation for

14   Mr. Ramsey reporting safety concerns and following LOTO procedures.  (*Id.* ¶ 8; *see*

15   Weaver Rep.)  He submitted his investigation report to Boeing's ECA team for review on

16   August 5, 2019.  (Weaver Decl. ¶ 10.)

17       4.    Mr. Bakki's Termination and Appeal

18       Because the allegations that Mr. Weaver substantiated implicated safety on the

19   Boeing 737 aircraft, the ECA team empaneled a Special Attention Review ("SAR")

20   committee to determine the appropriate level of discipline for Mr. Bakki.  (*Id.* ¶ 10;

21   Miller Decl. (Dkt. # 25) ¶ 3.)  The SAR committee consisted of multiple Boeing

22   executives and was facilitated by ECA Program Steven Miller and ECA Focal Lynn

Adams.  (Miller Decl. ¶ 4.)  According to Mr. Miller, the SAR committee reviewed Boeing's Employee Corrective Action Process Requirements ("ECAPR") matrix and determined that the presumptive discipline level for Mr. Bakki's conduct was "time off work."  (*Id.* ¶¶ 1, 6-7; *see also id.* ¶ 2, Ex. S (ECAPR matrix); Garner Decl. (Dkt. # 26) ¶ 5.)  After reviewing the aggravating factors for the violation, the SAR committee voted unanimously to elevate the level of discharge from "time off work" to "discharge." (Miller Decl. ¶ 8; Garner Decl. ¶¶ 6-7.)  Mr. Bakki was notified of his termination on August 28, 2019.  (*See* Miller Decl. ¶ 11, Ex. U (8/28/19 CAM).)

On September 13, 2019, Mr. Bakki appealed his termination.  (*See id.* ¶ 12, Ex. V ("Appeal Letter").)  Mr. Bakki challenged the findings of Mr. Weaver's investigation and set forth his version of the facts underlying his decision to transfer Mr. Ramsey.  (*See generally id.*)  He contended that Mr. Weaver spoke with him for only fifteen minutes, in addition to a brief follow-up call, and that he would have provided more information during the investigation if he had known that the investigation could lead to his termination.  (*See id.*)  Mr. Bakki did not allege in his letter that he had been subjected to discrimination or retaliation.  (*See generally id.*)  An appeal team consisting of ECA subject-matter experts and representatives from Employee Relations and Human Resources denied the appeal.  (Miller Decl. ¶¶ 13-14.)

5.   Subsequent Events

In the summer of 2020, Mr. Bakki's former coworker Richalbe Rapier discussed Mr. Bakki's termination from Boeing with Mr. Davis and several other WSI mechanics.

1    (Rapier Dep.[7] at 41:24-42:18.)  During the conversation, Mr. Davis said, referring to Mr.

2    Bakki, "Yeah, man, you didn't hear?  We got rid of your boy Lance."[8]  (*Id.* at 47:6-14.)

3    **B.    Procedural Background**

4         On January 24, 2020, Mr. Bakki filed a complaint in King County Superior Court

5    alleging claims for discrimination, retaliation, and aiding and abetting discrimination in

6    violation of the Washington Law Against Discrimination ("WLAD"), ch. 49.60 RCW;

7    for wrongful termination in violation of public policy; and for intentional infliction of

8    emotional distress/outrage.  (Compl. ¶¶ 4.1-4.31.)  On February 14, 2020, Boeing

9    removed the case to this court on the basis of diversity.  (*See* Not. of Removal (Dkt. # 1).)

10        On May 28, 2020, the court granted Boeing's partial motion to dismiss Mr.

11   Bakki's intentional infliction of emotional distress/outrage claim.  (*See generally* 5/28/20

12   Order (Dkt. # 15).)  Although the court granted Mr. Bakki leave to file an amended

13   complaint (*see id.* at 11-12), he did not do so (*see generally* Dkt.).

14        Boeing now moves the court to dismiss on summary judgment all of Mr. Bakki's

15   remaining claims.  (*See generally* MSJ.)  Mr. Bakki moves to seal certain exhibits to his

16   response to Boeing's motion for summary judgment.  (*See generally* MTS.)

17

18        ───────────────────

19        [7] Both parties have submitted excerpts from Mr. Rapier's deposition.  (*See* Bushaw Decl.
     ¶ 6, Ex. E; Vizcaino Decl. ¶ 10, Ex. J.) For ease of reference, the court cites directly to the page
     and line number of the deposition.

20
     [8] Mr. Bakki also states that Boeing employee Courtney Mortimer approached Mr. Rapier
21   and "contradicted Mr. Davis'[s] claim that Mr. Bakki had used racially charged language against
     Mr. Boyd."  (MSJ Resp. at 13.)  Although Mr. Bakki cites Mr. Rapier's deposition for this
22   proposition, he did not submit the cited deposition page with his response.  (*See generally* Rapier
     Dep.)

### III.   ANALYSIS

The court begins by considering Mr. Bakki's motion to seal before proceeding to analyze Boeing's motion for summary judgment.

**A.   Motion to Seal**

Mr. Bakki moves to seal Exhibits E, I, K, L, O, and P to the declaration of Ruth Vizcaino filed in support of his opposition to Boeing's motion for summary judgment. (*See generally* MTS; *see* Vizcaino MTS Decl. (Dkt. # 31-1); *see also* Vizcaino MSJ Decl. ¶ 17, Exs. E, I, K, L, O, P; *see* Dkt. # 33 (sealed exhibits).)  Mr. Bakki moves to seal these documents because Boeing marked them "Confidential" pursuant to the parties' stipulated protective order.  (MTS at 2 (citing Stip. Prot. Order (Dkt. # 18)).)

Local Rule LCR 5(g)(3)(B) provides that a motion to seal a document must include "a specific statement of the applicable legal standard and the reasons for keeping a document under seal, with evidentiary support from declarations where necessary." Local Rules W.D. Wash. LCR 5(g)(3)(B).  However, where the parties have entered into a stipulated protective order, "a party wishing to file a confidential document it obtained from another party in discovery may file a motion to seal but need not satisfy subpart (3)(B) above." *Id.*, LCR 5(g)(3).  "Instead, the party who designated the document confidential must satisfy subpart (3)(B) in its response to the motion to seal or in a stipulated motion." *Id.*  Here, therefore, the party that must satisfy the standard for sealing set forth in Local Rule LCR 5(g)(3)(B) is Boeing.

When deciding a motion to seal, courts "start with a strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135

1    (9th Cir. 2003) (citing *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995)).  This

2    presumption, however, "is not absolute and can be overridden given sufficiently

3    compelling reasons for doing so." *Id.* (citing *San Jose Mercury News, Inc. v. U.S. Dist.*

4    *Ct. N. Dist. (San Jose)*, 187 F.3d 1096, 1102 (9th Cir. 1999)).  The standard for

5    determining whether to seal a record depends on the filing to which the sealed record is

6    attached.  *See id.* at 1136-37.  Because the sealed documents at issue here are attached to

7    a motion that is "more than tangentially related to the merits of [this] case," the court

8    applies the compelling reasons standard to determine if sealing is appropriate.  *See Ctr.*

9    *for Auto Safety v. Chrysler Grp.*, 809 F.3d 1092, 1098-102 (9th Cir. 2016).

10           Under the compelling reasons standard, the party seeking to seal a judicial record

11   bears the burden of showing that "compelling reasons supported by specific factual

12   findings . . . outweigh the general history of access and the public policies favoring

13   disclosure." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir.

14   2006) (internal citations omitted).  A failure to meet that burden means the record will be

15   filed in public.  *Id.* at 1182.  If a court decides to seal a record, it must "base its

16   decision on a compelling reason and articulate the factual basis for its ruling." *Id.* at 1179

17   (quoting *Hagestad*, 49 F.3d at 1434).  Compelling reasons to justify sealing a document

18   include the risk that an individual might be exposed to the disclosure of information that

19   could result in "substantial harm, embarrassment, inconvenience, or unfairness."

20   *Delaittre v. Berryhill*, No. C15-1905RAJ, 2017 EL 6310483, at *4 (W.D. Wash. Dec. 11,

21   2017) (denying motion to unseal documents that included information about discipline of

22   third parties).  The final determination of what constitutes a compelling reason is "best

1    left to the sound discretion of the trial court."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S.

2    589, 599 (1978).

3          Boeing does not oppose Mr. Bakki's motion to seal.  (*See generally* MTS Resp.)

4    Boeing, however, joins Mr. Bakki's motion only with respect to Exhibit I, which is a

5    document relating to discipline imposed on a Boeing employee who is not a party in this

6    matter.  (*Id.* at 2.)  This is the only document for which Boeing argues that "compelling

7    reasons" to seal exist, namely that the third-party disciplinary document implicates

8    significant privacy interests.  (*See id.* at 2-3.)  It states that it treats employee disciplinary

9    information as highly confidential and discloses it only on a need-to-know basis.  (*Id.* at

10   3-4 (citing Weaver MTS Decl. (Dkt. # 37) ¶¶ 3-4).)  It further argues that publication of

11   the non-party employee's disciplinary record would violate the employee's privacy and

12   "expose him to public scrutiny while serving no countervailing public interest in

13   transparency."  (*Id.* at 4.)  The court agrees, and GRANTS Mr. Bakki's motion to seal

14   Exhibit I to the Vizcaino Declaration.  Because no party has argued that compelling

15   reasons exist to maintain under seal Exhibits E, K, L, O, and P to the Vizcaino

16   Declaration, however, the court DENIES Mr. Bakki's motion to seal these documents.

17   **B.    Motion for Summary Judgment**

18         Boeing moves for summary judgment on all four of Mr. Bakki's remaining claims.

19   The court sets forth the standard of review on motions for summary judgment and then

20   applies that standard to Mr. Bakki's claims of race discrimination, aiding and abetting

21   discrimination, retaliation, and wrongful discharge in violation of public policy.

22

1      1.      Summary Judgment Standard

2          Summary judgment is appropriate if the evidence viewed in the light most

3  favorable to the non-moving party shows "that there is no genuine dispute as to any

4  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

5  56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Beaver v. Tarsadia Hotels*,

6  816 F.3d 1170, 1177 (9th Cir. 2016).  A fact is "material" if it might affect the outcome

7  of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute

8  is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the

9  non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001)

10  (citing *Anderson*, 477 U.S. at 248-49).

11          The moving party bears the initial burden of showing there is no genuine dispute

12  of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

13  323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

14  show the absence of such a dispute in two ways:  (1) by producing evidence negating an

15  essential element of the nonmoving party's case, or (2) by showing that the nonmoving

16  party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

17  *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

18  meets its burden of production, the burden then shifts to the nonmoving party to identify

19  specific facts from which a factfinder could reasonably find in the nonmoving party's

20  favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

21          The Ninth Circuit has provided additional guidance for when an employer brings a

22  motion for summary judgment in an employment discrimination case.  Such motions

1    must be carefully examined in order to "zealously guard an employee's right to a full

2    trial, since discrimination claims are frequently difficult to prove without a full airing of

3    the evidence and an opportunity to evaluate the credibility of the witnesses." *Weil v.*

4    *Citizens Telecom Servs. Co.*, 922 F.3d 993, 1002 (9th Cir. 2019) (quoting *McGinest v.*

5    *GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) (internal quotation marks

6    omitted)).  This high standard means that an employee needs "very little evidence" to

7    survive summary judgment in a discrimination case "because the ultimate question is one

8    that can only be resolved through a 'searching inquiry' – one that is most appropriately

9    conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80

10   F.3d 1406, 1410 (9th Cir. 1996) (quoting *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1563 (9th

11   Cir. 1994)). Indeed, "any indication of discriminatory motive may suffice to raise a

12   question that can only be resolved by a factfinder." *Weil*, 922 F.3d at 1002 (quoting

13   *Schnidrig*, 80 F.3d at 1409) (internal quotation marks and edits omitted)).

14       2.   Discrimination on the Basis of Race

15           a.   *Legal Standard*

16       Washington has adopted the three-step evidentiary burden-shifting framework

17   announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for evaluating

18   motions for summary judgment on discrimination claims that rely on circumstantial

19   evidence. *Scrivener v. Clark Coll.*, 334 P.3d 541, 544 (Wash. 2014).  First, an employee

20   must make a prima facie case of discrimination by showing (1) he is a member of a

21   protected class; (2) he suffered an adverse employment action; (3) similarly situated

22   employees outside the protected class were treated more favorably; and (4) he and the

nonprotected comparator were doing substantially the same work.  *See Washington v. Boeing Co.*, 19 P.3d 1041, 1048 (Wash. Ct. App. 2001).  If the employee establishes a prima facie case, a rebuttable presumption of discrimination exists.  *Scrivener*, 334 P.3d at 546.

Second, the burden shifts to the employer, who must articulate a legitimate, nonretaliatory reason for taking the adverse action against the employee.  *Id.*

Third, if the employer meets this burden, the employee must produce sufficient evidence to show that the employer's alleged nonretaliatory reason for the discharge was a "pretext."  *Id.*  "An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer."  *Id.*  Because an employer's decision may be based on both legitimate and illegitimate reasons, the employee is not required to show that retaliation was the only motivating factor for the discharge.  *See id.*

   b.   *Mr. Bakki's Discrimination Claim*

Boeing argues that it is entitled to summary judgment on Mr. Bakki's discrimination claim because Mr. Bakki (1) cannot establish a prima facie case of discrimination (MSJ at 16-17) and (2) cannot show that Boeing's nondiscriminatory reasons for disciplining him and terminating his employment were pretextual (*id.* at 17-19).  The court agrees.

Boeing contends that Mr. Bakki cannot make out a prima facie case of

1   discrimination because he cannot show that he was treated less favorably than any

2   similarly situated manager.  (MSJ at 16-17.)  It points out that it terminated Mr. Rapier,

3   an African-American manager, for making derogatory race-based comments.  (*Id.* at 17

4   (citing Rapier Dep. at 106:6-25, 107:15-108:5; Bushaw Decl. ¶ 7, Ex. F).)  It further

5   contends that Mr. Bakki has not presented evidence that Boeing's legitimate non-

6   discriminatory reason for disciplining him—Ms. Harding's finding that Mr. Bakki made

7   a derogatory race-based comment about Mr. Boyd—was pretext for discrimination.  (*Id.*

8   at 17-19.)

9       In response, Mr. Bakki argues that he was falsely accused of using racially

10  derogatory language.  (MSJ Resp. at 15-17.)  He contends that Boeing wrongfully issued

11  the CAM; that Mr. Boyd "used Mr. Bakki's race to make allegations that he called him

12  'boy' in a racially derogatory manner more probable for Boeing investigators to believe;"

13  and that Mr. Boyd did not complain that Mr. Bakki called him "boy" until Ms. Kilman

14  interviewed him about the safety violation.  (*Id.* at 15-17.)  He contends, without citation

15  to evidence or authority, that if he had been African-American and called Mr. Boyd

16  "boy," it is "highly unlikely that Mr. Boyd would [] have used race as an anchor for a

17  complaint,"  and that Mr. Davis's reference to Mr. Bakki as "boy" during his

18  conversation with Mr. Rapier would "never be perceived as racially derogatory" since

19  both Mr. Bakki and Mr. Davis are Caucasian.  (*Id.* at 16.)  He argues that the timing of

20  Mr. Boyd's allegation that Mr. Bakki made a racially derogatory comment against him

21  "heavily implies that Mr. Boyd, in concert with Mr. Davis, used Mr. Bakki's race to

22  make his allegation more credible when the facts plainly showed an individual using race

1    against an employee as a way to avoid discipline." (*Id.* at 17.) He contends that Ms.

2    Harding should not have substantiated Mr. Boyd's complaint based on inconsistencies in

3    Mr. Boyd's deposition, which took place nearly two years after her investigation was

4    complete. (*Id.*)

5        Mr. Bakki has not met his burden on summary judgment to establish a genuine

6    issue of material fact that would allow his discrimination claim to proceed. He relies

7    chiefly on speculation that the events at issue would have transpired differently if he had

8    been African-American and points to no evidence that would create a genuine dispute of

9    fact that Boeing treated him less favorably than others who are not of his race. Indeed, he

10   makes no effort in his response to explain to the court how the evidence he cites

11   establishes a prima facie case that Boeing's actions were motivated by discrimination.

12   (*See id.* at 15-17.) Even if Mr. Bakki were able to make out a prima facie case, he makes

13   no argument that Boeing's legitimate nondiscriminatory reason for disciplining him was

14   pretextual. (*See id*.) For these reasons, the court GRANTS Boeing's motion for

15   summary judgment on Mr. Bakki's race discrimination claim.

16       3.    <u>Aiding and Abetting Discrimination</u>

17       The WLAD establishes liability for aiding, abetting, encouraging, or inciting the

18   commission of discrimination on the basis of race. RCW 49.60.220. Without an

19   underlying act of discrimination, there can be no claim for aiding and abetting

20   discrimination. *See id.* Because Mr. Bakki has not met his burden to show facts that

21   would allow a reasonable jury to find in his favor on his discrimination claim, his aiding

22   and abetting claim necessarily fails. *See* Fed. R. Civ. P. 56. Therefore, the court

1    GRANTS Boeing's motion for summary judgment on Mr. Bakki's aiding and abetting

2    claim.

3        4.    Retaliation

4        The WLAD prohibits an employer from retaliating against an employee for

5    opposing any discriminatory practice forbidden under that statute.  RCW 49.60.210.  To

6    prove a claim of retaliation under the WLAD, an employee must show (1) that he took a

7    statutorily protected action, (2) that he suffered an adverse employment action, and (3) a

8    causal link between his protected activity and the adverse employment action.  *See*

9    *Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 (Wash. 2018).  As with discrimination

10   claims, Washington has adopted the three-step evidentiary burden-shifting framework

11   announced in *McDonnell Douglas* for evaluating motions for summary judgment on

12   retaliation claims that rely on circumstantial evidence.  *Cornwell*, 430 P.3d at 234 (citing

13   *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 404 P.3d 464, 470 (Wash. 2017)).

14       Boeing contends that Mr. Bakki's retaliation claim must fall because Mr. Bakki

15   did not engage in activity protected by the WLAD.  (MSJ at 20-21.)  It points out that Mr.

16   Bakki testified that he never complained to anyone at Boeing that he suffered from

17   discrimination, harassment, or retaliation on the basis of his race.  (*Id.* at 21 (citing Bakki

18   Dep. at 131:13-132:3, 133:5-134:3).)  It also asserts that Mr. Bakki cannot show

19   causation or that Boeing's legitimate non-retaliatory reasons for its actions were

20   pretextual.  (*See id.* at 21.)

21       Mr. Bakki argues that he engaged in protected activity when he "addressed Mr.

22   Boyd's safety violations."  (MSJ Resp. at 23.)  He contends that when he reported these

1   violations, Mr. Boyd "proceeded to retaliate against [Mr. Bakki] by raising false

2   allegations of racial discrimination." (*Id.*)  He further asserts that his decision to

3   recommend Mr. Boyd for corrective action for safety violations was a substantial factor

4   in Boeing's decision to issue Mr. Bakki a CAM. (*Id.* at 24.)  But safety violations are not

5   practices forbidden by the WLAD. *See* RCW 49.60.210; *see generally* ch. 49.60 RCW.

6   Rather, Mr. Bakki has the burden to produce evidence that, viewed in the light most

7   favorable to him, would tend to show that he suffered retaliation for either opposing

8   practices forbidden by the WLAD or participating in proceedings under the WLAD.

9   RCW 49.60.210; Fed. R. Civ. P. 56.  He has not met that burden.  Because Mr. Bakki has

10   not shown that he engaged in protected activity within the meaning of the WLAD, the

11   court GRANTS Boeing's motion for summary judgment on Mr. Bakki's WLAD

12   retaliation claim.[9]

13       5.    Wrongful Discharge in Violation of Public Policy

14       As a narrow exception to the employment at will doctrine, an employer cannot

15   terminate an employee for "'reasons that contravene a clear mandate of public

16   policy.'" *Martin v. Gonzaga Univ.*, 425 P.3d 837, 842-43 (Wash. 2018) (quoting

17   *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1089 (Wash. 1984)).  In general,

18   Washington courts have limited the tort of wrongful discharge in violation of public

19   policy to four scenarios:  "'(1) where employees are fired for refusing to commit an

20   illegal act; (2) where employees are fired for performing a public duty or obligation, such

21

22       [9] Because the court grants Boeing's motion for summary judgment on this ground, it does not address Boeing's causation and pretext arguments.

1   as serving jury duty; (3) where employees are fired for exercising a legal right or

2   privilege, such as filing workers' compensation claims; and (4) where employees are

3   fired for reporting employer misconduct, i.e., whistleblowing.'" *Id.* at 843 (quoting

4   *Gardner v. Loomis Armored, Inc.*, 913 P.2d 377, 382 (Wash. 1996)).  Because Mr.

5   Bakki's claim does not fit neatly into any of those categories, he is proceeding under the

6   alternative "Perritt framework" for wrongful discharge in violation of public policy

7   claims.  (*See* MSJ Resp. at 20); *see Martin*, 425 P.3d at 843.  Under this framework, a

8   plaintiff must prove four elements:  (1) the existence of a clear public policy (the clarity

9   element); (2) that discouraging the conduct in which the plaintiff engaged would

10  jeopardize the public policy (the jeopardy element); (3) that the public-policy-linked

11  conduct caused the plaintiff's dismissal (the causation element); and (4) that the employer

12  did not establish an overriding justification for the plaintiff's dismissal.  *Martin*, 425 P.3d

13  at 843 (citing *Gardner*, 913 P.2d at 382).

14          The clarity element "can be established by prior judicial decisions or

15  constitutional, statutory, or regulatory provisions or schemes."  *Id.* at 844 (quoting

16  *Dicomes v. State*, 782 P.2d 1002, 1006 (Wash. 1989)).  To establish jeopardy, a plaintiff

17  must show he engaged in particular conduct that directly relates to the public policy or

18  was necessary for the effective enforcement of the public policy.  *Rickman v. Premera*

19  *Blue Cross*, 358 P.3d 1153, 1159 (Wash. 2015).  "This inquiry may be satisfied by

20  showing 'the employee sought to further the public good, and not merely private or

21  proprietary interests.'"  *Id.* (quoting *Dicomes* 782 P.2d at 1008).  To show causation, a

22  plaintiff must show not only that his discharge may have been motivated by reasons that

1   contravene a clear mandate of public policy, but also that the public-policy-linked

2   conduct was a substantial factor in the decision to discharge the plaintiff. *Martin*, 425

3   P.3d at 844.

4        Mr. Bakki contends that "public policy exists which encouraged safe working

5   conditions for Boeing employees." (MSJ Resp. at 21.) He argues that L&I and OSHA

6   regulate safety standards for manufacturing companies such as Boeing, and that Boeing

7   accordingly has numerous internal policies to regulate workplace safety. (*Id.*) Mr. Bakki

8   contends that he was enforcing the public policy encouraging workplace safety by

9   temporarily moving Mr. Ramsey to position zero. (*Id.*) He asserts that if he had not

10  moved Mr. Ramsey, P-8 would have been understaffed, "causing a chain reaction of

11  delays logically jeopardizing workplace safety in addition to proper, safe, and efficient

12  manufacturing of airplanes." (*Id.*) He argues that he can establish causation because his

13  decision to move Mr. Ramsey was directly linked to his termination. (*Id.* at 22.)

14       Assuming, without deciding, that the public policy Mr. Bakki relies upon meets

15  the clarity element of his claim, the court concludes that Mr. Bakki has not established a

16  genuine issue of material fact as to jeopardy or causation. Mr. Bakki presents no

17  evidence that his decision to move Mr. Ramsey to position zero was motivated by his

18  desire to further the public good, nor has he shown that Boeing's decision to terminate

19  him was motivated by reasons that contravene the public policy of workplace safety. *See*

20  *Rickman*, 358 P.3d at 1159; *Martin*, 425 P.3d at 844. To the contrary, Mr. Bakki

21  contends that he was simply doing his job as a manufacturing manager by moving Mr.

22  Ramsey to position zero and that Boeing wrongfully terminated him for "correctly and

appropriately performing his duties." (*See* MSJ Resp. at 21-22; *see also id.* at 9 (stating that Mr. Ramsey's move was "a necessary business decision executed by management").)

Mr. Bakki also argues that Mr. Davis's "admission" to Mr. Rapier that he "got rid of" Mr. Bakki creates a genuine issue of material fact regarding Boeing's motivation for his termination.  (MSJ Resp. at 21-2; *see id.* at 13.)  He contends that "as a matter of public policy, employees charged with upholding workplace safety policies . . . should not be discouraged from recommending discipline due to fear of being received as racis[t] merely because a superior is Caucasian and a subordinate is a person of color." (*Id.* at 22.)  Even if this were a cognizable public policy within the meaning of the wrongful discharge tort, Mr. Bakki has identified no evidence that he sought to further the public good when he decided to report Mr. Boyd's safety violations or that Boeing's decision to terminate his employment was motivated in any way by his decision to report those violations.  Indeed, Mr. Bakki acknowledged that his termination "doesn't have anything to do with the safety violation."  (*See* Bakki Dep. at 104:20-105:9.)

Because Mr. Bakki has not met his burden to identify specific facts that would reasonably allow a jury to find in his favor on the jeopardy and causation elements of the Perritt framework, the court GRANTS Boeing's motion for summary judgment on Mr. Bakki's wrongful discharge in violation of public policy claim.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Mr. Bakki's motion to seal (Dkt. # 31) and GRANTS Boeing's motion for summary judgment

(Dkt. # 21).  Within five days of the filing date of this order, Mr. Bakki shall re-file

Exhibits E, K, L, O, and P to the Vizcaino Declaration (Dkt. # 33) without seal.[10]


Dated this 15th day of March, 2021.


_____

JAMES L. ROBART
United States District Judge

---

[10] For future reference, the court directs Mr. Bakki's counsel to review LCR 5(g)(4), which states that each exhibit to be filed under seal "shall be filed as a separate sealed docket entry."  Local Rules W.D. Wash. LCR 5(g)(4).  This enables the Clerk to unseal specific documents when the court denies in part a motion to seal.  *See id.* LCR 5(g)(6).